1

2

3

4

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

5

6

| | |
|---|---|
| KEVIN WELLER, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| REALPAGE, INC.; GREYSTAR REAL ESTATE PARTNERS, LLC; LINCOLN PROPERTY CO.; CUSHMAN & WAKEFIELD, INC.; FPI MANAGEMENT, INC.; RPM LIVING, LLC; BH MANAGEMENT SERVICES, LLC; MID-AMERICA APARTMENT COMMUNITIES, INC.; MORGAN PROPERTIES LP; AVENUE5 RESIDENTIAL, LLC; BOZZUTO MANAGEMENT COMPANY; AVALONBAY COMMUNITIES, INC.; HIGHMARK RESIDENTIAL, LLC; EQUITY RESIDENTIAL; THE IRVINE COMPANY, LLC; ESSEX PROPERTY TRUST, INC.; ZRS MANAGEMENT, LLC; CAMDEN PROPERTY TRUST; UDR, INC.; CONAM MANAGEMENT CORPORATION; CORTLAND PARTNERS, LLC; THRIVE COMMUNITIES MANAGEMENT, LLC; SECURITY PROPERTIES INC.; CWS APARTMENT HOMES, LLC; PROMETHEUS REAL ESTATE GROUP, INC.; SARES REGIS GROUP OPERATING, INC.; MISSION ROCK RESIDENTIAL, LLC; and MORGAN GROUP, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
Case No.

## NATURE OF THE ACTION

1.     Plaintiff Kevin Weller ("Plaintiff") challenges a cartel among lessors of multifamily residential real estate leases ("Lessors") to artificially inflate the prices of multifamily residential real estate in the United States above competitive levels.

2.     Until approximately 2016, and potentially earlier, many of the nation's largest Lessors priced their leases based upon their own assessments of how to best compete against other Lessors.  Prior to 2016, Lessors generally priced their units competitively to maximize output by maximizing physical occupancy (that is, maximizing the percentage of multifamily residential leaseholds that were occupied by paying tenants).  Lessors had an incentive to lower their prices to attract lessees away from their competitors, until all available leases were sold.  In this way, competition drove rent levels to reflect available supply of rental units and lessee demand.  Lessors also independently determined when to put their leases on the market, resulting in unpredictable supply levels—a natural phenomenon in a competitive market.  When supply exceeded demand, Lessors cut prices.

3.     As explained by a former industry executive and a primary developer of software at issue in this case, Donald Davidoff, Lessors face "a classic prisoners' dilemma."  Since residential real estate is a perishable resource (if a unit sits vacant for a month, a Lessor can never monetize that lost month of rent), Lessors favored a strategy of keeping "heads in the beds," a term for offering sufficiently attractive lease pricing to maximize physical occupancy levels in multifamily residential real estate properties.  Thus, Davidoff opined, while all Lessors collectively "would be better off limiting their rent [price] reductions," if any Lessor individually "lower[ed] their rents while the others don't, then that [individual Lessor] would outperform" vis-à-vis their competitors.  In the absence of assurances that all Lessors would collectively be limiting their rental price reductions, then, the prisoner's dilemma dictated that the prudent course was to reduce price and compete for market share.

4.     However, beginning in approximately 2016, and potentially earlier, Lessors replaced

CLASS ACTION COMPLAINT - 1
Case No.

their independent pricing and supply decisions with collusion.  Lessors agreed to use a common third party that collected competitively sensitive real-time pricing and supply levels from them, and then used that data to make unit-specific pricing and supply decisions for Lessors. Lessors also agreed to adhere to these decisions, on the understanding that competing Lessors would do the same.

5.     That third party is RealPage, Inc. ("RealPage").  RealPage provides software and data analytics to Lessors.  RealPage also serves as the mechanism by which Lessors collude and avoid competition, increasing lease prices to Plaintiff and other members of the proposed Class. RealPage openly boasts that its services "balance supply and demand to maximize [Lessors'] revenue growth."  And that is precisely what RealPage has done, facilitating an agreement among participating Lessors not to compete on price, and allowing Lessors to coordinate both pricing and supply through at least two mutually reinforcing mechanisms in furtherance of their agreed aim of suppressing price competition for multifamily residential real estate leases.

6.     First, Lessors "outsource daily pricing and ongoing revenue oversight" to RealPage, replacing separate centers of independent decision-making with one.  RealPage collects up-to-the-minute data on the historical and contemporaneous pricing from participating Lessors, data that, according to RealPage, is updated "every time [Lessors] make or change a [lease] renewal offer," spanning over "16 million units," which is a "very large chunk of the total inventory in the country." It standardizes this data to account for differences in the characteristics or "class" of the property in question. RealPage then runs this massive dataset through its pricing algorithm, whereby RealPage and its "Pricing Advisors" set prices for participating Lessors through application of a common formula.  RealPage touts that it sets pricing for Lessors' "properties as though we own them ourselves"—i.e., the participating Lessors' cartel replicates the market outcomes one would observe if they were a single seller or monopolist of residential leases.

7.      RealPage Pricing Advisors are central to RealPage and the Lessors' ability to achieve centralized, coordinated prices among Lessors. RealPage directly employs Pricing

CLASS ACTION COMPLAINT - 2
Case No.

Advisors who are assigned to particular Lessors and integrated into their price setting process. These Pricing Advisors are involved in setting the baseline rules for how the common algorithm functions, viewing the outputs of the algorithm, finalizing pricing decisions for the Lessors, and providing guidance on adhering to RealPage's price-setting system. The Pricing Advisors are assigned to groups of competing Lessors operating in a particular geographic area or city; put another way, multiple competing Lessors in a given area or city are outsourcing their pricing functions to the same common algorithm, with the algorithm's output interpreted by the same individual human being, mimicking a monopoly outcome.

8.      While these Pricing Advisors are assigned to oversee pricing for a particular group of competing Lessors in a particular geographic area or city, RealPage ensures that their focus and goals remain raising rents across that area or city as a whole as opposed to for Lessors on an individualized basis. Indeed, RealPage directly ties compensation for its Pricing Advisors to whether they have been successful in raising rents across their assigned area or city *overall*—not to their ability to meet revenue goals for their assigned competing Lessors. Pricing Advisors accordingly aim to raise prices across their assigned group of competing Lessors *as well as* the prices of other competing Lessors, assigned to other Pricing Advisors, but located in the same area or city. To accomplish this goal Pricing Advisors routinely coordinate with one another and share forward-looking pricing plans, ultimately inflating prices for all competing Lessors within a given region or city and establishing "an artificial floor" for RealPage provided rental prices.

9.      While Lessors are able to reject the RealPage pricing through an onerous process, RealPage emphasizes the need for "discipline" among participating Lessors.  To encourage adherence to its common scheme, RealPage explains that for its services to be most effective in increasing rents, Lessors must accept the pricing at least eighty percent of the time. RealPage also directly incentivizes each Pricing Advisor, through its compensation structure, to push Lessors to follow RealPage pricing and maintain higher prices across their assigned submarket. These efforts are successful, with Ryan Kimura, a former RealPage executive, explaining that as many as 90

CLASS ACTION COMPLAINT - 3
Case No.

percent (and at least 80 percent) of prices are adopted by participating Lessors.

10.     A former executive of one of the companies that originally developed the revenue management software ("CI 1")[1] explained that RealPage's pricing decisions were "rarely overwritten." Put simply, and as a representative of Lessor ECI Group, Emily Mask, explains, while "we [Lessors] are all technically competitors," RealPage "helps us [Lessors] work together," "to work with a community in pricing strategies, not to work separately."

11.     Second, RealPage allows participating Lessors to coordinate supply levels to avoid price competition.  In a competitive market, there are periods where supply exceeds demand, and that in turn puts downward pressure on market prices as firms compete to attract lessees.  To avoid the consequences of lawful competition, RealPage provides Lessors with information sufficient to "stagger" lease renewals to avoid oversupply.  Lessors thus held vacant rental units unoccupied for periods of time (rejecting the historical adage to keep the "heads in the beds") to ensure that, collectively, there is not one period in which the market faces an oversupply of residential real estate properties for lease, keeping prices higher.

12.     By staggering lease renewals to artificially smooth out natural imbalances of supply and demand, RealPage and participating Lessors also eliminate any incentive to undercut or cheat on the cartel (avoiding a race to the bottom, or "prisoner's dilemma").  This is a central mantra of RealPage, to sacrifice "physical" occupancy (i.e., to decrease output) in exchange for "economic" occupancy, a manufactured term RealPage uses to refer to increasing prices and decreasing physical occupancy levels (output) in the market.

13.     RealPage's and participating Lessors' coordinated efforts have been effective at driving anticompetitive outcomes: higher prices and lower physical occupancy levels (output). RealPage brags that participating Lessors experience "[r]ental rate improvements, year over year, between 5% and 12% in every market."  The CEO of Defendant Lessor Camden, Ric Campo, has touted that the net effect of raising rents and "pushing people out" of the residential real estate leases

---

[1] CI 1 Interview (Nov. 4, 2022).

CLASS ACTION COMPLAINT - 4
Case No.

they could no longer afford, was "$10 million in income." As discussed below, RealPage and participating Lessors have accomplished their goals of ratcheting up prices even under unprecedented market downturns such as the COVID-19 pandemic.

14. RealPage is proud of its role in the exploding increase in the prices of residential leases. In a marketing video used to attract additional Lessors to the cartel, a RealPage Vice President, Jay Parsons, discussed the recent and never-before seen price increases for residential real estate leases, as high as 14.5% in some markets. When he went on to ask another RealPage executive: "What role has the [RealPage] software played" in those unprecedented rental price increases, that RealPage executive, Andrew Bowen, Vice President of Investor Markets, responded: "I think it's driving it, quite honestly."

15. In a confidential interview, however, a former RealPage employee who was directly involved in creation of the original software has expressed dismay with the way RealPage has enabled Lessors to collectively raise rents at this breakneck pace. This collusion in turn has placed massive pressure on renters' efforts to keep roofs over their heads. CI 1, an early developer of RealPage's pricing software reflected that "these optimization systems are really efficient at extracting value and they will push things [as far as they can] until they start to break."

16. If left unchecked, RealPage and its participating Lessors' cartel stand to break the multifamily residential real estate lease market and continue to exacerbate the affordable housing crisis facing this Nation. The cartel Plaintiff challenges is unlawful under Section 1 of the Sherman Act. Plaintiff brings this action to recover their damages, trebled, as well as injunctive and other appropriate relief, detailed *infra*, on behalf of all others similarly situated.

## PARTIES AND UNNAMED CO-CONSPIRATORS

17. Plaintiff Kevin Weller is a citizen and resident of the State of New Jersey. Mr. Weller rented a multifamily residential unit in a property managed by Lessor Defendant Equity Residential in Jersey City, New Jersey beginning in approximately April 2021 through the present. Mr. Weller has paid higher rental prices directly to a co-conspirator by reason of the violation

CLASS ACTION COMPLAINT - 5
Case No.

alleged herein.

18.     Defendant RealPage, Inc. is a Delaware corporation headquartered in Richardson, Texas.  RealPage was a public company from 2010 until December 2020, when it was purchased by private equity firm Thoma Bravo in a transaction that valued RealPage at approximately $10.2 billion.  RealPage provides software and services to the residential real estate industry, including the RMS described herein.  RealPage has thousands of employees and earns over a billion dollars per year in revenue.  As of December 31, 2019, RealPage had over 29,800 clients, including each of the ten largest multifamily property management companies.

19.     Lessor Defendant Greystar Real Estate Partners, LLC ("Greystar") is a Delaware limited liability company headquartered in Charleston, South Carolina.  It is the largest manager of multifamily rental real estate in the United States, with more than 782,900 multifamily units and student beds under management nationally.  On information and belief, Greystar earns billions of dollars per year in revenue, controls $35.5 billion dollars in assets, and employs over 20,000 people.

20.     Lessor Defendant Lincoln Property Co. ("Lincoln") is a Texas corporation headquartered in Dallas, Texas.  Lincoln is the second largest manager of multifamily rental real estate in the United States, with over 210,000 multifamily units under management nationally.  On information and belief, Lincoln earns billions of dollars per year in revenue and employs thousands of people.

21.     Lessor Defendant Cushman & Wakefield, Inc. ("C&W") is a Delaware corporation headquartered in New York, New York. It is the third largest manager of multifamily rental real estate in the United States, with over 172,000 multifamily units under management nationally. On information and belief, C&W earns billions of dollars per year in revenue and employs over ten thousand people.

22.     Lessor Defendant FPI Management, Inc. ("FPI") is a California corporation headquartered in Folsom, California.  FPI is the fifth largest manager of multifamily rental real estate in the United States, with over 150,000 multifamily units under management in 17 states.  On

CLASS ACTION COMPLAINT - 6
Case No.

1   information and belief, FPI earns billions of dollars per year in revenue and employs thousands of
2   people.

3           23.     Lessor Defendant RPM Living LLC ("RPM") is a Texas limited liability company
4   headquartered in Austin, Texas. RPM is the seventh largest manager of multifamily rental real estate
5   in the United States, with over 112,000 units under management in 21 states.  On information and
6   belief, RPM earns hundreds of millions of dollars per year and employs hundreds of people.

7           24.     Lessor Defendant BH Management Services, LLC ("BH") is an Iowa limited
8   liability company with its headquarters in Des Moines, Iowa. BH is the eighth largest manager of
9   multifamily rental real estate in the United States, with over 100,000 multifamily units under
10  management in 28 states. On information and belief, BH earns over one billion dollars per year in
11  revenue and employs over 2,000 people.

12          25.     Lessor Defendant Mid-America Apartment Communities, Inc. ("MAA") is a
13  Tennessee corporation headquartered in Germantown, Tennessee.  MAA is the tenth largest
14  manager of multifamily rental real estate in the United States, with over 100,000 multifamily units
15  under management in 16 states.  On information and belief, MAA earns over one billion dollars per
16  year in revenue and employs over 2,400 people.

17          26.     Lessor Defendant Morgan Properties LP ("Morgan Properties") is a Pennsylvania
18  limited partnership headquartered in King of Prussia, Pennsylvania.  Morgan is the eleventh largest
19  manager of multifamily rental real estate in the United States, with over 96,000 multifamily units
20  under management in 20 states. On information and belief, Morgan earns hundreds of millions of
21  dollars per year in revenue and employs hundreds of employees.

22          27.     Lessor Defendant Avenue5 Residential, LLC ("Avenue5") is a Delaware limited
23  liability company headquartered in Seattle, Washington.  Avenue5 is the twelfth largest manager
24  of multifamily rental real estate in the United States, with over 96,900 multifamily units under
25  management in 12 states.  On information and belief, Avenue5 earns over $500 million dollars per
26  year in revenue and employs over 1,000 people.

27
28  CLASS ACTION COMPLAINT - 7
    Case No.

28.     Lessor Defendant Bozzuto Management Company ("Bozzuto") is a Maryland company headquartered in Greenbelt, Maryland. Bozzuto is the thirteenth largest manager of multifamily rental real estate in the United States with over 80,000 multifamily units under management in 12 states. On information and belief, Bozzuto earns over two billion dollars per year in revenue and employs over 3,000 people.

29.     Lessor Defendant AvalonBay Communities, Inc. ("AvalonBay") is a Maryland corporation headquartered in Arlington, Virginia. AvalonBay is the fourteenth largest manager of multifamily rental real estate in the United States, with over 88,000 units under management in twelve states.  On information and belief, AvalonBay earns billions of dollars per year in revenue and employs thousands of people.

30.     Lessor Defendant Highmark Residential, LLC ("Highmark") is a Delaware limited liability company headquartered in Dallas, Texas. Highmark is the fifteenth largest manager of multifamily rental real estate in the United States, with over 79,000 units in 15 states. On information and belief, Highmark earns hundreds of millions of dollars per year in revenue and employs over 1,500 people.

31.     Lessor Defendant Equity Residential ("Equity") is a Maryland real estate investment trust headquartered in Chicago, Illinois.  Equity is the sixteenth largest manager of multifamily rental real estate in the United States, with over 80,000 units under management in 9 states and Washington, D.C.  On information and belief, Equity earns over 2 billion dollars per year in revenue and employs over 2,000 people.

32.     Lessor Defendant The Irvine Company, LLC ("Irvine") is a Delaware limited liability company headquartered in Newport Beach, California. Irvine is the twenty-third largest manager of multifamily real estate in the United States, with over 63,000 units under management in 5 states. On information and belief, Irvine earns millions of dollars per year in revenue and employs over 1,000 people.

33.     Lessor Defendant Essex Property Trust, Inc ("Essex") is a Maryland corporation

CLASS ACTION COMPLAINT - 8
Case No.

headquartered in San Mateo, California.  Essex is the twenty-fourth largest manager of multifamily rental real estate in the United States, with over 61,000 units under management in California and Washington.  On information and belief, Essex earns over 1.4 billion dollars per year in revenue and employs over 1,700 people.

34.     Lessor Defendant ZRS Management, LLC ("ZRS") is a Florida limited liability company headquartered in Orlando, Florida. ZRS is the twenty-seventh largest manager of multifamily rental real estate in the United States, with over 60,000 units under management in 6 states. On information and belief, ZRS earns millions of dollars per year in revenue and employs hundreds of people.

35.     Lessor Defendant Camden Property Trust ("Camden") ("Camden") is a Texas real estate trust headquartered in Houston, Texas. Camden is the twenty-ninth largest manager of multifamily rental real estate in the United States, with over 58,000 units under management. On information and belief, Camden earns over one billion dollars per year in revenue and employs over 1,000 people.

36.     Lessor Defendant UDR, Inc. ("UDR") is a Maryland corporation headquartered in Highlands Ranch, Colorado. UDR is the thirtieth largest manager of multifamily rental real estate in the United States, with over 55,000 units under management. On information and belief, UDR earns over one billion dollars per year in revenue and employs over 1,000 people.

37.     Lessor Defendant CONAM Management Corporation ("CONAM") is a California corporation headquartered in San Diego, California. CONAM is the thirty-third largest manager of multifamily rental real estate in the United States, with over 51,000 units under management. On information and belief, CONAM earns hundreds of millions of dollars per year in revenue and employs over 1,000 people.

38.     Lessor Defendant Cortland Partners, LLC ("Cortland") is a Georgia limited liability company headquartered in Atlanta, Georgia. Cortland has over 85,000 units under management in 13 states. On information and belief, Cortland earns hundreds of millions of dollars in revenues per

CLASS ACTION COMPLAINT - 9
Case No.

year and employs over 1,000 people.

39.     Lessor Defendant Thrive Communities Management, LLC ("Thrive") is a Washington Limited Liability Company headquartered in Seattle, Washington.  Thrive has over 18,000 units under management in the greater Pacific Northwest.  On information and belief, Thrive earns millions of dollars per year in revenue and employs over 500 people.

40.     Lessor Defendant Security Properties Inc. ("Security Properties") is a Washington corporation headquartered in Seattle, Washington.  Security Properties has over 22,000 units under management in 18 states.  On information and belief, Security Properties earns millions of dollars per year in revenue.

41.     Lessor Defendant CWS Apartment Homes, LLC ("CWS") is a Delaware limited liability company headquartered in Austin, Texas. CWS has over 29,000 units under management. On information and belief, CWS earns millions of dollars per year in revenue and employs over 500 people.

42.     Lessor Defendant Prometheus Real Estate Group, Inc. ("Prometheus") is a California corporation headquartered in San Mateo, California. Prometheus has over 12,000 multifamily units under management in California, Oregon, and Washington. On information and belief, Prometheus earns millions of dollars per year in revenue and employs hundreds of people.

43.     Lessor Defendant Sares Regis Group Operating, Inc. ("Sares Regis") is a California corporation headquartered in Newport Beach, California. Sares Regis has over 29,000 units under management. On information and belief, Sares Regis earns millions of dollars in revenue per year and employs hundreds of people.

44.     Lessor Defendant Mission Rock Residential, LLC ("Mission Rock") is a Delaware limited liability company headquartered in Denver, Colorado. Mission Rock has over 29,000 units under management in 17 states. On information and belief, Mission Rock earns tens of millions of dollars per year in revenue and employs over 700 people.

45.     Lessor Defendant Morgan Group Inc. ("Morgan Group") is a Delaware corporation

CLASS ACTION COMPLAINT - 10
Case No.

headquartered in Houston, Texas.  Morgan Group has over 15,000 units under management in 5 states. On information and belief, Morgan earns millions of dollars per year in revenue and employs hundreds of employees.

46.     The Lessor Co-Conspirators are various persons and entities, including Lessors and other industry participants, known and unknown to Plaintiff and not named as defendants in this action, who have participated as co-conspirators with RealPage and the Lessor Defendants in the offenses alleged and have performed acts and made statements in furtherance of the cartel.

## JURISDICTION AND VENUE

47.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

48.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and Washington's long-arm statute, the Revised Code of Washington § 4.28.185.

49.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the sale of multifamily residential real estate leases.

50.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the sale of multifamily residential real estate leases.

51.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## FACTUAL BACKGROUND

### The Market for Multifamily Residential Real Estate Leases

52.     The relevant product market is the market for the lease of multifamily residential

CLASS ACTION COMPLAINT - 11
Case No.

1  real estate and the relevant geographic market is the United States.

2      53.    From the perspective of the consumer, multifamily rental apartment units are not an

3  economic substitute with apartments, condominiums, or homes for purchase because, among other

4  reasons, purchase of real estate requires the ability to make a substantial down payment and to

5  obtain financing.

6      54.    Additionally, from the perspective of the consumer, single-family real estate is not

7  an economic substitute for multifamily residential real estate.  For example, single-family properties

8  typically do not offer amenities and security.  Indeed, industry participants in the multifamily

9  residential real estate market typically distinguish between multifamily and single-family real estate

10  when discussing customer preferences and market trends, including concerning their disparate

11  respective pricing.

12      55.    The multifamily residential real estate lease market satisfies the test for market

13  definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The

14  test asks whether a hypothetical monopolist in a proffered market could profitably impose a small

15  but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a

16  sufficient number of customers to switch to other products or services such that the SSNIP would

17  be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined.  If the

18  SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient

19  economic substitutes.

20      56.    Here, the SSNIP test is satisfied, and the market is properly defined.  As described

21  above and below, pursuant to the Lessors' agreement not to compete on price, Lessors are able to

22  increase "year over year, between 5% and 12% in every market," yet those increases have not driven

23  enough renters out of the market such that the SSNIP has become unprofitable to Lessors.

24      **Historical Pricing in the Market for Multifamily Residential Real Estate Leases**

25      57.    Before RealPage facilitated collusion among Lessors, Lessors acting independently

26  followed a policy to keep "heads in the beds."  In simplest terms, this meant the market was

27
28  CLASS ACTION COMPLAINT - 12
   Case No.

functioning competitively.  Lessors, concerned that every day a property remained unrented was a lost opportunity to earn revenue for that day, offered sufficiently attractive pricing to maintain maximum "physical occupancy" across their units.  This could come in the form of reduced rental prices and sometimes other price concessions, such as "first month free" offers.

58.     The "heads in the beds" strategy also minimized turnover expenses, as there were hard costs associated with finding and evaluating a replacement tenant as well as lost revenue opportunities if the unit sat vacant between tenants.

59.     The senior vice president of property management at Defendant Lessor the Morgan Group, David Hannan, described the market before RealPage's arrival, stating that a "generation" of Lessors "grew up worshipping the occupancy gods. We learned that if you were not 95 percent-plus occupied, the asset was failing." Prior to 2016, Lessors accomplished their goals of "worshipping the occupancy gods" and "keeping heads in the beds" through "manual pricing," a term Lessors use to refer to uncoordinated, independent pricing.  This led Lessors to maximize physical occupancy levels (output) by offering sufficiently low pricing to attract tenants to sign new, or renew existing, leases.  In economics, this is referred to as a market share over price strategy, and it is a common defining characteristic of a market that is functioning competitively.

**The Lessor Defendants Outsource Price and Supply Decisions to a Common Decision Maker—RealPage—Which Eliminated Competition**

60.     Following RealPage's entry, RealPage's participating Lessors swiftly, and concertedly, shifted from the previous competitive market share over price strategy to a new collusive price over volume strategy.  A price over volume strategy is a hallmark of pricing in a cartelized market.

61.     RealPage and participating Lessors have adopted a philosophy of maximizing economic occupancy, that is, increasing prices notwithstanding market conditions and tolerating any reduced physical occupancy levels that might engender.  Since Lessors of residential multifamily real estate properties (a finite resource) face a natural prisoner's dilemma, maximizing

CLASS ACTION COMPLAINT - 13
Case No.

economic occupancy is only in a firm's economic self-interest if many Lessors collectively follow suit. As Davidoff—a primary developer of what is now RealPage's revenue management software—stated, while all Lessors "would be better off limiting their rent [price] reductions," if any Lessor "lower[ed] their rents while the others don't, than that [Lessor] would outperform." The easiest way to solve the prisoner's dilemma, such that it would be profit maximizing to maintain high prices, would be if Lessors had mutual assurances that other Lessors would not compete with them on price.

62. RealPage and participating Lessors have provided one another with such mutual assurances, agreeing among themselves not to compete on price for the sale of multifamily residential real estate leases. They have effectuated their agreement through two mutually reinforcing mechanisms. First, participating Lessors have agreed to set prices using RealPage's coordinated algorithmic pricing. Second, participating Lessors have agreed to stagger their lease renewal dates through RealPage, to avoid (otherwise natural) oversupplies in rental properties.

63. RealPage's coordinated algorithmic pricing allows participating Lessors, in RealPage's words, to "outsource [their] daily pricing and ongoing revenue oversight" to RealPage, with RealPage pricing for participating Lessors' "properties as if we [RealPage] own them ourselves"—that is, as if RealPage and its participating Lessors were operating as a single seller or a monopolist.

64. Participating Lessors agree to adhere to RealPage's coordinated algorithmic pricing, often referring to such adherence as pricing "courage," or, more frequently, as pricing "discipline."

65. Participating Lessors also agree to provide RealPage with real-time access to their competitively sensitive and nonpublic data on their multifamily residential real estate leases.

66. This data, according to RealPage, spans over "16 million units," which is a "very large chunk of the total inventory in the country." RealPage standardizes this data to account for differences in the characteristics or "class" of the property in question. RealPage then runs this

CLASS ACTION COMPLAINT - 14
Case No.

massive dataset through its pricing algorithm, whereby RealPage and its Pricing Advisors set prices for participating Lessors through application of a common formula to a common dataset.

67.     RealPage Pricing Advisors ensure and advance coordination in price setting between Lessors. RealPage assigns each Pricing Advisor to a group of competing Lessors in a given geographic area or city, and tasks them with integrating themselves into each of their assigned competing Lessor's price setting processes. It is problematic enough that groups of competing Lessors in a given area or city are outsourcing their price-setting functions to the same algorithm and same individual Pricing Advisor. But each Pricing Advisor also coordinates price increases with other Pricing Advisors that are assigned to different groups of competing Lessors in the same region or city, and they are incentivized to do so because a percentage of each Pricing Advisor's compensation is linked to the amount that prices increase across their assigned geographic area or city—not to their ability to meet revenue goals for the individual Lessors they advise. Pricing Advisors accordingly aim to raise prices across their assigned group of competing Lessors as well as coordinate with other Pricing Advisors assigned to different groups of competing Lessors in the same area or city on a forward-looking basis, inflating prices across an area or city.

68.     CI 1, a former industry executive closely involved in development of RealPage's pricing software explained that, once there are centralized Pricing Advisors at the helm, the software acts as "a deterministic tool" wherein "if you put in the same values you get the same results" across Lessors.

69.     Every morning, each Pricing Advisor reviews the results of the pricing algorithm, as well as information from fellow Pricing Advisors, in order to direct prices for each of their assigned competing Lessors, increasing rental prices across Lessors in an area or city, and establishing "an artificial floor" for rental prices in that area or city. The Pricing Advisors then provide their assigned competing Lessors with pricing for the day.

70.     Lessors typically must communicate to their assigned Pricing Advisor that they

CLASS ACTION COMPLAINT - 15
Case No.

have "accept[ed]" or "confirm[ed] the "approved pricing" within a specified time frame. If Lessors wish to diverge from the "approved pricing" they must submit detailed reasoning (for example, the rental unit in question had structural or flood damage that the algorithm was unaware of) for doing so; one former RealPage employee who provided Lessors training on its software and systems ("CI 2")[2] explained that in her experience, those overrides had to be approved by RealPage, while another former RealPage Pricing Advisor explained, "there's got to be a good reason indicated" for the override to be approved, such as "circumstances outside what the model is aware of."

71.     RealPage encourages participating Lessors to have daily calls between the Lessors' employees with pricing responsibility and the RealPage Pricing Advisor. RealPage also directly incentivizes each Pricing Advisor, through its compensation structure, to push Lessors to follow RealPage pricing and maintain higher prices across their assigned area or city. One former RealPage Director ("CI 3")[3] explained that RealPage monitored and strongly discouraged overrides, and endeavored "to make sure they're [Lessors] following what the model is asking them to do." And according to RealPage trainer CI 2, at least some Pricing Advisors informed their assigned competing Lessors that they were *without discretion* to override pricing determined by RealPage and Lessors *had to* adhere to those pricing decisions.

72.     If there is a disagreement between the participating Lessor and the RealPage Pricing Advisor, the dispute is often elevated to the Lessor's management for resolution to evaluate the specific reasons a Lessor provided for departing from RealPage's pricing decisions. Importantly, this very same Pricing Advisor that is resolving the dispute about the recommended pricing is also setting pricing for competitors of the Lessor in question *as well as* communicating with other Pricing Advisors setting pricing for still more competing Lessors in a given area or city, with the aim of increasing pricing across the area or city as a whole (because the Pricing Advisors compensation is determined by how a particular area or city performs as a whole, rather than how

[2] CI 2 Interview (Jan. 12, 2022).
[3] CI 3 Interview (Dec. 3, 2021).

CLASS ACTION COMPLAINT - 16
Case No.

well individual Lessors to which it is assigned perform).

73.      RealPage emphasizes the need for discipline among participating Lessors and urges them that for its coordinated algorithmic pricing to be the most successful in increasing rents, participating Lessors must adopt RealPage's pricing at least 80% of the time. CI 1 described the pricing as "rarely overwritten." As one example of such encouragement, Jeffrey Roper, RealPage's main architect, publicly described the problem as: "If you have idiots undervaluing [setting prices independently], it costs the whole system." And an Executive Vice Chairman for Defendant Lessor Camden, Keith Oden,  explained that "it's not like we sit around and do what we think we feel like we should be doing for rental increases. It's all driven by the metrics within [the algorithm] and we take those recommendations."

74.      Ryan Kimura, a former RealPage executive, reported that these instructions are successful, with as many as 90% (and at least 80%) of RealPage pricing being adopted. As one Lessor explained to media outlet ProPublica, RealPage's coordinated algorithmic pricing required counterintuitive changes in their business practices "because[, upon adopting RealPage's coordination of pricing,] we weren't offering concessions nor were we able to negotiate pricing" like they previously had. That Lessor went on to explain that RealPage "maximize[s] rents but you have to be willing to strictly follow it," and, as a result, "we rarely make any overrides to the recommendations" provided by RealPage. Davidoff, a primary developer of the software, described RealPage as bringing "discipline" and "courage to pricing."

75.      And a former RealPage Senior Operations Analyst ("CI 4")[4] explained that RealPage "definitely discouraged" overrides and "essentially encourage[d] you to take the offering that the system projected and use that." CI 4 explained that "[t]he goal is and was to maximize the returns of the property management companies. And how do you do that? You do that by raising rents. It was very clear that that's the way things were structured. That was the name of the game." For that reason, CI 4 explained "we don't recommend overrides."

---

[4] CI 4 Interview (Dec. 16, 2021).

CLASS ACTION COMPLAINT - 17
Case No.

76.     Participating Lessors are also able to stagger their lease renewals to avoid natural periods of oversupply that would persist absent concerted action by would-be rival Lessors, with RealPage providing guidance on such staggering.

77.     A representative of Lessor ECI Group, Emily Mask, explained that, using RealPage, Lessors are "now able to stagger lease expirations throughout the month, effectively cutting down on frictional vacancy loss as well as concessions" on price. Mask continued that by staggering lease renewals, Lessors have "leveled the lease expirations throughout the year to better match the historical demand for each community, thus positioning us [Lessors] for even higher rent growth."

78.     A former Business Manager for Lessor Pinnacle Property Management Services LLC ("Pinnacle"), subsidiary of Lessor Defendant C&W, ("CI 5")[5] explained that RealPage helped Pinnacle avoid a situation where there were a significant number of units renewing at the same time. RealPage "would recommend a 10-month lease instead of a 12-month lease on certain people [to avoid simultaneous renewals]," he said. "Or a 13-month lease – to try to get it to that next month [so that] instead of having 15 renewals, you would end up with 10 renewals." RealPage trainer CI 2 explained that once lease expiration limits for a certain time period were reached, the RealPage "system will not allow you to create another lease to expire during that time unless you override" the system.

79.     Lessors have publicly admitted that RealPage has allowed them to maintain higher prices in concert, with confidence that they can avoid price cutting and the prisoner's dilemma.

80.      One representative of Lessor ECI Group, Mask, commented that while "we [Lessors] are all technically competitors," that Lessors' common adoption of and adherence to RealPage's software "helps us [Lessors] work together," "to work with a community in pricing strategies, not to work separately."

81.     Other Lessors' comments echo the potency and efficacy of their concerted action.

---

[5] CI 5 Interview (Nov. 5, 2021).

CLASS ACTION COMPLAINT - 18
Case No.

82.     In promotional materials, Defendant Lessor BH reported that RealPage "has given a substantial boost to economic occupancy" (the proportion of gross potential rent actually realized) as compared to physical occupancy (the proportion of units occupied by tenants), which is to say it caused higher rental prices and less physical occupancy (or output).

83.     Another representative from a Lessor, Senior Vice President of Asset Management at LaSalle Investment Management, Stephen Adams, explained that by "outsourcing" pricing functions to RealPage, prices are set by RealPage's "multifamily experts," "who essentially act like an extension of our team."

84.     And Campo, CEO of Defendant Lessor Camden, explained that in following the price over volume, or maximizing economic capacity, strategy, they found "that driving our turnover rate up actually captured additional revenue." Campo continued: "The net effect of driving revenue and pushing people out was $10 million in income." He concluded, "I think that shows that keeping the heads in the beds above all else is not always the best strategy." But given the prisoner's dilemma faced by Lessors, rejecting that competitive strategy is only in a Lessor's economic self-interest if they have assurances that they will not be significantly undercut by rival Lessors. RealPage provides a mechanism through which Lessors coordinate their prices and effectuate that common understanding.

85.     RealPage also encourages direct coordination among competing Lessors to increase the cartel's efficacy and Lessors' adherence to the scheme. Specifically, RealPage directs Lessors to call up competing Lessors directly and discuss and confirm one another's current prices.  This revelation is particularly stark, not just because it allows the Lessors to monitor and ensure compliance with the coordinated algorithmic pricing, but because RealPage itself has admitted that such a practice is tantamount to collusion.

86.     For example, one former Leasing Manager from Defendant Lessor CONAM ("CI 6")[6] explained that, in following RealPage's instructions to routinely collect current, non-public

---

[6] CI 6 Interview (Oct. 26, 2022).

CLASS ACTION COMPLAINT - 19
Case No.

rental prices from their competitors, several Lessors, including Defendant Lessor Irvine, participated in an email chain in which Leasing Managers shared non-public information about rental unit pricing on a regular basis. And, one former Leasing Consultant from Defendant Lessor MAA ("CI 7")[7] described that, to assist in collecting competitors' pricing data, RealPage even provided a form containing the names of competitors to call and the information to obtain. According to CI 7, she called competing properties every Tuesday to obtain updated pricing information, or "the price for that day," and would use the RealPage form to guide those calls: "You kind of just go down the list and fill out the blanks."

87.    RealPage, in response to this lawsuit, has defended its conduct by claiming that "typically" Lessors engaged in "manual pricing" (a term of art RealPage uses for any pricing that is not recommended by revenue management systems) by conducting phone surveys to check competitors' rents, which RealPage has claimed publicly could result in anticompetitive behavior. RealPage claims that its offerings thus "help eliminate the risk of collusion that could occur with manual pricing" and the Lessor-to-Lessor communication RealPage claims would occur. But that Lessor-to-Lessor communication on pricing is not proscribed by RealPage, it is encouraged by RealPage, despite RealPage itself recognizing its collusive nature.

**The Lessor Defendants and RealPage Have Inflated the Prices and Reduced the Occupancy (i.e., Output) of Residential Real Estate Leases**

88.    As industry participants, including RealPage's own executives admit, RealPage's coordinated algorithmic pricing has caused anticompetitive effects in the form of higher prices and reduced output. As just one such example, RealPage's Vice President of Investor Markets, Andrew Bowen, has publicly conceded that: "I think it's [RealPage's coordinated algorithmic pricing] driving it [higher prices for residential real estate leases], quite honestly."

89.    RealPage advertises that the Lessors that participate in this cartel experience "[r]ental rate improvements, year over year, between 5% to 12% in every market," the ability to

---

[7] CI 7 Interview (Nov. 18, 2021).

CLASS ACTION COMPLAINT - 20
Case No.

"outperform the market by up to 5%," and "drive up to an additional 150-200 basis points of hidden yield" that would not otherwise be attainable to a Lessor utilizing independent pricing, rather than coordinated pricing. RealPage refers to independent, competitive pricing as "manual pricing." RealPage claims to "outperform manual pricing" by 7 percent each year.  That is, the Lessors' collusion succeeds in increasing prices above competitive levels by 7 percent each year.

90.     To conclude that these price increases would be economically irrational and against each Lessors' independent economic self-interest if acting alone (that is, absent assurances that other Lessors would also be exercising pricing "discipline"), or that price increases would be unachievable absent the implementation of coordinated algorithmic pricing by RealPage's participating Lessors, one need look no further than the admissions of RealPage and its participating Lessors, who openly extol the value of cartelization (higher prices, lower output) to each other.

91.     In a testimonial video on RealPage's website, the Director of Revenue Management at Lessor JVM Realty, Kortney Balas, explained that "the beauty of using [RealPage's pricing] is that it pushes [Lessors] to go places that you wouldn't have gone on your own if you weren't using it."

92.     The CEO of Defendant Equity, David Neithercut, told panelists at an industry conference that it "raised rents hundreds of dollars," following RealPage's pricing, and noted that Equity would not have had "the courage to push [rents] as aggressively as [the RealPage pricing] program has."

93.     President and COO of Camden, Keith Oden, admitted that, in the natural state of play, it simply is "not in [a Lessor's] DNA to raise pricing $150 to $200 per unit on a lease turn," but following RealPage's coordinated algorithmic pricing allowed Camden and other Lessors to do what, independently, they would not.

94.     And Kip Zacharias who worked at Camden as a consultant observed that the Lessor was able to raise rents in situations where market conditions dictated otherwise, with a consultant for that Lessor conceding that "[i]f you'd listened to your gut," and not RealPage's pricing, then

CLASS ACTION COMPLAINT - 21
Case No.

"you would have lowered your price."

95.     And yet another Lessor representative—Jamie Teabo, Senior Vice President for Management at Post Properties—noted that, "[i]n our Florida markets, we let the system push as hard as it would go, and we saw increases as high as 20 percent. . . . Left to our own devices, I can assure you we would have never pushed rents that hard. That was a big number."

96.     RealPage itself concedes that these price levels could not be obtained independently, stating: "We believe in overseeing properties as though we own them ourselves. We believe we can deliver better results for you than you would otherwise be able to achieve." In plain terms, RealPage concedes that its coordinated algorithmic pricing allows Lessors to obtain the same results as a single seller or monopolist—an outcome Lessors "would not otherwise be able to achieve" without RealPage's pricing and assurances of Lessors' discipline to that pricing.

97.     The COVID-19 pandemic is a prime illustration of Lessors' ability to coordinate pricing through RealPage and achieve market outcomes untethered to what one would expect if Lessors were acting independently of one another. A RealPage Vice President of Revenue Management, Amy Dreyfus, explained that "at the start of COVID, I think a lot of our [Lessors'] initial reaction, was, 'oh I need to start dropping rent, I need to start giving [price] concessions'" to account for the exodus of renters from major metropolitan areas. But "our [RealPage's] advisory team and the product did a great job" of resisting that natural competitive outcome. RealPage's Vice President of Asset Optimization and Deputy Chief Economist, Jay Parsons, agreed with that assessment, noting "we just saw unbelievable resilience and I would say discipline in pricing through the worst of the downturns . . . a lot of people thought we'd see severe rent cuts; that just didn't happen." That "resilience" and "discipline" is "unbelievable" precisely because absent assurances that competitor Lessors are not going to undercut a given Lessor on price, such discipline is against the Lessor's individual economic self-interest.

98.     While RealPage insiders dubbed this pricing discipline "a great job," some of the Lessors' employees actually enforcing RealPage's price recommendations considered this

CLASS ACTION COMPLAINT - 22
Case No.

"unbelievable resilience" to be "a nightmare." Explaining that Pinnacle used RealPage to raise monthly rents on some units by several hundreds of dollars during the beginning and middle of the COVID-19 pandemic, CI 5 said, RealPage "was recommending that I raise rents $400 to $500 a month per unit[.] It was a nightmare. It was embarrassing. It was absolutely ridiculous."

99.     RealPage has undertaken this conduct with full and complete knowledge of its illegality. One of RealPage's pricing software's main architects, Jeffery Roper, is acutely familiar with the anticompetitive nature of coordinated algorithmic pricing within an industry. Before pioneering RealPage's software, Roper was Alaska Airlines' Director of Revenue Management when it and other airlines began using common software to share nonpublic planned routes and prices with each other, with the aim of heading off price wars. The Department of Justice's Antitrust Division ("DOJ") reached settlements or consent decrees for price fixing violations with eight airlines, including Alaska Airlines. Roper—who had his computer and documents seized by federal agents—relayed about that experience that, "We all got called up before the Department of Justice in the early 1980s because we were colluding." He adds that at the time, "we had no idea" that conduct was unlawful. Having now brought analogous coordinated algorithmic pricing to multifamily residential real estate leasing after the DOJ's airline settlements, however, Roper can no longer claim ignorance of the unlawful nature of this conduct.

100.     Other former RealPage employees and individuals who were directly involved in creation of the original software—including CI 1—have expressed dismay with the way RealPage has enabled Lessors to collectively raise rents at this breakneck pace. This collusion in turn has placed massive pressure on renters' efforts to keep roofs over their heads. CI 1, an early developer of RealPage's pricing software, reflected that "these optimization systems are really efficient at extracting value and they will push things [as far as they can] until they start to break."

### "Plus Factors" Render the Market for Multifamily Residential Real Estate Leases Susceptible to the Formation, Maintenance, and Efficacy of a Cartel

101.     The market for the sale of multifamily residential real estate leases from Lessors to lessees is characterized by numerous features, referred to as "plus factors," that render the industry

CLASS ACTION COMPLAINT - 23
Case No.

susceptible to collusion, such that the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) high barriers to exit, (3) market concentration, (4) inelastic consumer demand, (5) relative fungibility of residential real estate leases, (6) exchanges of competitively sensitive information among horizontal competitors, and (7) numerous opportunities to collude at trade associations and RealPage functions.

102.    First, multifamily residential real estate properties owners and operators face significant entry barriers. These include the high cost of acquiring property, establishing a property management infrastructure, and ongoing costs of building maintenance and regulatory compliance. Even small multifamily rental properties cost millions of dollars to acquire. Large properties, such as those operated by Greystar, run into the hundreds of millions of dollars to own and manage and take several years and significant experience to build or acquire. Thus, new entrants into the residential real estate leasing market are unlikely to discipline cartel pricing.

103.    Second, lessees of multifamily residential real estate properties face high exit barriers. Renters typically incur substantial cost and inconvenience when moving, and where price escalation is occurring in broad geographic areas, they might not have a lower priced option in reasonable proximity to where they currently live or work. As such, lessees cannot easily turn to alternative Lessors of multifamily residential real estate properties to discipline cartel pricing.

104.    Third, the demand for multifamily residential real estate property leases is relatively inelastic. The only realistic alternative to renting is buying, and for most renters, that is not an option financially or logistically. Thus, no reasonable substitutes exist to discipline cartel pricing.

105.    Fourth, the market for residential real estate property leases is highly concentrated. Most major metropolitan areas are dominated by relatively few sellers, with many large corporations like Greystar having substantial presences in metropolitan areas throughout the United States.

106.    Fifth, multifamily residential real estate properties are relatively fungible, particularly within classes of properties. That is, when controlling for certain high-level

CLASS ACTION COMPLAINT - 24
Case No.

characteristics of properties—such as the number of bedrooms and bathrooms, amenities, location, or the age of the building—properties within those classes are relatively fungible. Lessors have explained that RealPage's pricing software "is correctly looking at 'like' competitor properties and 'truly comparing apples to apples' as it relates to competitor apartment pricing."

107.    Sixth, RealPage's participating Lessors, directly and using RealPage as a conduit, share competitively sensitive information with one another. In addition to its price-setting and lease renewal-staggering services, RealPage collects non-public data on multifamily residential real estate properties and creates benchmarking reports that allow for quick comparisons of a Lessor's performance on occupancy and price for similar property classes vis-à-vis the industry. This function could not be recreated using any public, non-competitively sensitive sources as the advertised rates for residential real estate leases typically diverge from the actual rates.

108.    Seventh, RealPage and participating Lessors have ample opportunities to collude.

109.    Lessors have been involved in the development of RealPage's pricing software from its inception. The original forms of this software were initially developed by companies that were partially owned and controlled by Lessors, including Defendant Lessors Camden and Equity. CI 1, a former executive of one of the companies that developed the original software, confidentially explained that the company included Lessors in a "strategic customer council" that was "very involved in setting the strategic functionality" of the software. For example, the strategic customer council "advocated" for the inclusion of "lease expiration management" – a component of the software that adjusts pricing to increase prices for leases that would expire in times of higher overall supply, thereby allowing Lessors to coordinate supply levels and avoid competition.

110.    Following RealPage's acquisition of the software, RealPage and participating Lessors continue to routinely interact with one another, share information, and collaborate on the development of RealPage's price setting mechanisms behind closed doors.

111.    As just one example, RealPage operates a private RealPage User Group Forum, an association of some thousand participating Lessors, which, according to RealPage, aims "to

CLASS ACTION COMPLAINT - 25
Case No.

improve communications between RealPage and the user [Lessor] community," while "promot[ing] communication between users [Lessors]" themselves. Within that Forum is an "Idea Exchange," where Lessors submit their own recommendations for changes or improvements to RealPage's offerings, as well as provide comments on proposed changes that RealPage is considering implementing to its software offerings.

112.    As another example, RealPage organizes certain in-person events and collaboration among participating Lessors.  It invites some to serve on a "Steering Committee," which liaises with certain subcommittees of the RealPage User Group Forum to ascertain Lessors' suggestions for RealPage's software offerings and with the explicit instruction to consider "the mutual benefit of all users."  RealPage also organizes a marquee annual, multi-day event called "RealWorld," where Lessors gather along with approved partners and executives from RealPage to network, exchange insights into key initiatives in the industry, and learn best practices for using RealPage tools.  Over the past five years, those conferences have been held in Las Vegas, NV, Nashville, TN, Orlando, FL, and virtually during the COVID-19 pandemic.

113.    RealPage has also invited Lessors to attend periodic "summits" to discuss RealPage's pricing software with RealPage and with one another, covering topics including (1) "Competitive Rent Analysis" or "[m]ethods of establishing and maintaining amenity-based prices for each unit and floor plan, factoring in comparable peer pricing," (2) "Supply Forecasts" and "Demand Forecasts," as well as (3) RealPage's "Pricing Engine," or "[m]ethods to price units in real time based on statistically validated price elasticity models."

114.    Finally, industry trade associations offer RealPage and participating Lessors additional opportunities to conspire.  As an illustrative example, the National Multifamily Housing Council ("NMHC"), which advertises itself as "the place where the leaders of the apartment industry come together to guide their future success," holds several events every year, including in person "Apartment Strategy Conference," an "Annual Meeting," a "Fall Meeting," hosted in cities including San Diego, CA, Las Vegas, NV, and Washington, DC. NMHC counts among its "Chair's

CLASS ACTION COMPLAINT - 26
Case No.

Circle Sponsors" RealPage, Greystar, and more participating Lessors.  NMHC "tracks market conditions through NMHC member surveys as well as data from data provider partners," to provide "industry benchmarks" on topics like "In Place Rent Per Square Foot," "Rent Change – New Leases," and "Rent Change – Renewals."

115.    Nearly fifty additional national and regional trade associations (or their local chapters) serve as conduits of the cartel, in the same way as NMHC by providing venues for RealPage and its participating Lessors to further their cartel's goals.

116.    National industry trade associations include: (1) Institute of Real Estate Management, (2) National Apartment Association, (3)National Association of Residential Property Managers, (4) Pension and Real Estate Association, and (5) Urban Land Institute.

117.    Regional associations and chapters include: (1) Apartment Association of Greater Dallas, (2) Apartment Association of Greater Orlando, (3) Apartment Association of Greater Los Angeles, (4) Apartment Association of Metro Denver, (5) Apartment Association of Orange County, (6) Apartment Association of Southeast Texas, (7) Apartment Owners Association of California, Inc., (8) Arizona Multihousing Association, (9) Atlanta Apartment Association, (10) Austin Apartment Association, (11) Bay Area Apartment Association, (12) Berkeley Property Owners Association, (13) California Apartment Association, (14) California Business Properties Association, (15) California Landlord Association, (16) California Rental Housing Association, (17) Chicagoland Apartment Association, (18) Colorado Apartment Association, (19) East Bay Rental Housing Association, (20) Florida Apartment Association, (21) Georgia Apartment Association, (22) Houston Apartment Association, (23) Illinois Rental Property Owners Association, (24) Maryland Multi-Housing Association, (25) Massachusetts Apartment Association, (26) Miami Dade Real Estate Investors Association, (27) Mid-Atlantic Real Estate Investors Association, (28) Nevada State Apartment Association, (29) Nor Cal Rental Property Association, (30) North Central Florida Apartment Association, (31) Northwest Florida Apartment Association, (32) Oregon Apartment Association, (33) Oregon Rental Housing Association, (34)

CLASS ACTION COMPLAINT - 27
Case No.

1  Portland Area Rental Owners Association, (35) Rental Housing Association of Washington, (36)

2  San Antonio Apartment Association, (37) San Francisco Apartment Association, (38) South Coast

3  Apartment Association, (39) South East Florida Apartment Association, (40) Southern California

4  Rental Housing Association, (41) Southwest Florida Apartment Association, (42) Texas Apartment

5  Association, (43) Washington Multi-Family Housing Association, and (44) Washington Landlord

6  Association.

7  **CLASS ACTION ALLEGATIONS**

8  118.    Plaintiff brings this action on behalf of themselves and all others similarly situated

9  pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class,

10  which is defined as follows:

> All persons and entities in the United States and its territories that are direct purchasers of multifamily residential real estate leases from a Lessor participating in RealPage's pricing software and/or lease renewal staggering software programs, or from a division, subsidiary, predecessor, agent, or affiliate of such Lessor, at any time during the period of October 18, 2018 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

15  119.    The Class is so numerous that joinder of all members in this action is impracticable.

16  There are tens of thousands if not hundreds of thousands of members in the proposed Class.

17  120.    Plaintiff's claims are typical of those of the Class.

18  121.    Plaintiff and all members of the Class were all injured by the same unlawful conduct,

19  which resulted in all of them paying more for multifamily residential leases than they otherwise

20  would have in a competitive market.

21  122.    Plaintiff will fairly and adequately protect and represent the interests of the Class.

22  The interests of the Plaintiff are not antagonistic to the Class.

23  123.    Questions of law and fact common to the members of the Class will predominate

24  over questions, if any, that may be individual to individual class members, since the Defendants

25  have acted and refused to act on grounds generally applicable to the Class.

26  124.    Questions of law and fact common to the Class include:

27  a.    Whether Defendants have entered into a formal or informal contract,

CLASS ACTION COMPLAINT - 28
28  Case No.

combination, conspiracy, or common understanding to artificially inflate price and/or artificially suppress supply of multifamily residential real estate leases from competitive levels;

b.    If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the *per se*, quick look, or rule of reason modes of analysis;

c.    If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply of multifamily residential real estate leases from competitive levels;

d.    The proper measure of damages; and

e.    The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

125.    Plaintiff is represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

126.    Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

**COUNT ONE**
**Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act**

127.    Plaintiff repeats and reallege all previous allegations as if fully set forth herein.

128.    Defendants have formed a cartel to artificially inflate the price of and artificially decrease the supply and output of multifamily residential real estate leases from competitive levels.

129.    The Defendants' cartel has caused the Class to suffer overcharge damages.

CLASS ACTION COMPLAINT - 29
Case No.

130.    There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

131.    The Defendants' cartel is unlawful under a per se mode of analysis. In the alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

## PETITION FOR RELIEF

Plaintiff petitions for the following relief:

A.    A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed class representative, and that Plaintiff's counsel be appointed as class counsel.

B.    A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a *per se*, quick look, or rule of reason mode of analysis.

C.    A judgment enjoining Defendants from engaging in further unlawful conduct.

D.    An award of attorneys' fees and costs.

E.    An award of pre- and post-judgment interest on all amounts awarded; and

F.    Such other relief as the Court deems just and equitable.

## REQUEST FOR A JURY TRIAL

Plaintiff requests a trial by jury of all issues so triable.

Dated: April 7, 2023

Respectfully submitted,

By:    */s/ Steve W. Berman*
    Steve W. Berman, WSB# 12536
By:    */s/ Breanna Van Engelen*
    Breanna Van Engelen, WSB #49213
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

CLASS ACTION COMPLAINT - 30
Case No.

*Local Counsel for Plaintiff*

Jason C. Spiro*
SPIRO HARRISON & NELSON
2 Bridge Avenue, Ste. 322
Red Bank, NJ 07701
Telephone: (862) 341-4804
Facsimile: (973) 232-0887
jspiro@shnlegal.com

David B. Harrison*
SPIRO HARRISON & NELSON
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
Telephone: (973) 232-4109
Facsimile: (973) 232-0887
dharrison@shnlegal.com

Michelle C. Clerkin*
SPIRO HARRISON & NELSON
228 Park Avenue South
New York, NY 10003
Telephone: (646) 880-8850
Facsimile: (973) 232-0887
mclerkin@shnlegal.com

*Counsel for Plaintiff*

*motion for admission *pro hac vice* forthcoming

CLASS ACTION COMPLAINT - 31
Case No.